IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ULLICO CASUALTY COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 1:14-CV-624 |
| v. | § | |
| | § | |
| STRONG STRUCTURAL STEEL, LTD., | § | |
| BRADEN & TREYTON MANAGEMENT, | § | |
| L.L.C., LAMAR STRONG, and NICOLE | § | |
| STRONG. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

To the Honorable Judge Yeakel:

COME NOW, Strong Structural Steel, Ltd., Braden & Treyton Management, L.L.C.,

Lamar Strong and Nicole Strong (collectively "Defendants"), and file this Defendants'

Response to Plaintiff's Motion for Partial Summary Judgment and Brief in Support, and

respectfully show as follows:

**I.**

**Statement of the Case**

1.1    Plaintiff has filed this lawsuit against Defendants alleging breach of an

indemnity agreement and exoneration.  Plaintiff provided surety bonds to Strong

Structural Steel, LTD. ("Strong") for various governmental projects that Strong worked

on.  Plaintiff alleges that it had to step-in on some of these projects, perform, and make

various payments.  Defendants contest the fact that the Plaintiff should have stepped-in

on these projects and contests the amount of payments made.  Defendants attempted to

prevent Plaintiff from making many of these payments and specifically advised Plaintiff

of problems with the same.  Plaintiff made the payments despite the warnings from

Defendants and now seeks indemnity from Defendants based on payments allegedly made due to these bond obligations totaling $397,307.69 as outlined in their Motion.

## II.

## Factual Background

### A. Case Facts

2.1    Strong is a commercial structural steel subcontractor that fabricates and erects steel for various projects throughout Texas and the United States. (Ex. B).  In order to work on governmental projects, Strong is required to provide performance and payment bonds prior to working on the projects.  To that end, Strong engaged Plaintiff to provide performance and payment bonds for various governmental projects. (Plaintiff's Motion for Partial Summary Judgment "MPSJ" – Record Document ("RD") #28.1).

2.2    On or about 9/16/08, Strong entered into a General Indemnity Agreement ("GIA") drafted by Ullico Casualty Company ("Ullico") (Ex. C).  The purpose of the GIA entered between Plaintiff and Strong was to indemnify the Surety for any payments made pursuant to bonds issued by the Surety on behalf of Strong before or after the date of the GIA. (Ex. C).  As this Court well knows, contractors are required to provide performance bonds in order to work on state/governmental projects.

2.3    Subsequent to the GIA, Strong was awarded the steel subcontract on a construction project successfully bid by Satterfield & Pontikes Construction, Inc. ("S&P") to construct facilities for the Adjutant General's Department in Travis County at the Austin Bergstrom International Airport. ("Austin Project") (Ex. B ¶2).  The primary buildings to be constructed on this project were an office building, the AFRC, and a maintenance facility, the JVMF. (Ex. B ¶3) The subcontracts between S&P and Strong were signed on 12/27/10 and 1/3/11, respectively, and required a performance

bond, which Strong obtained from Plaintiff and is referred to as bond No. SB00300371. (Ex. 1 and ¶2 to Ex. B; MPSJ RD 28 & 28.1). The subcontract scope of work was eventually agreed to on 1/28/11, but the project schedule was never fully agreed upon by the parties due to the omissions of S&P. (Ex. 1 and ¶4 to Ex B).

2.4    Despite numerous problems with the schedule; changes to the sequencing of the project; delayed predecessor activities; and delays by the architect, S&P, and other subcontractors, S&P terminated Strong indicating that Strong was solely responsible for all delays on the Austin Project through the date of termination on 1/30/11. (Ex B ¶¶ 3-6 - S&P 4715, 4734). At this point, Ullico entered into a Completion Agreement with S&P and retained Strong to complete the Austin Project under Ullico's supervision. (Ex. D. 6). Subsequently, Ullico paid various subcontractors retained by S&P to supplement Strong's work and speed-up the completion of Strong's contract even though the rush proved unnecessary. (Ex. B ¶8). S&P's Baseline Schedule anticipated 259 days to complete the construction of the AFRC building **after** steel erection was complete. S&P actually took 591 days to complete the remainder of its work after steel erection was complete, which was longer than its entire original Contract duration of 540 days. Such a lengthy period of completion occurred after Strong's work, and clearly was not the responsibility of Strong. (Ex. B ¶7).

2.5    During the completion of Strong's contract by Ullico, Strong and counsel reviewed the various bills submitted by S&P's supplemental contractors and located numerous instances of overcharging and charging for work outside the scope of Strong's contract. (Ex. B ¶9; D). Counsel for Strong sent multiple letters to Ullico's counsel regarding its concerns and implored Ullico not to pay the invoices associated with this supplementation of work on the Austin Project. (Ex. D. 1-4). Ignoring these pleas of Strong, as reflected in Plaintiff's Motion and supporting exhibit, Ullico chose to

pay multiple invoices that were being contested by Strong. (MPSJ – RD 28 & 28.1; Ex. D. 1-4). The Ullico loss detail, which is the supporting documentation for the checks issued by Ullico, is attached hereto and provides more details about the work actually billed by the subcontractors. (Ex. D. 5).

2.6     Other Strong contracts that required Ullico bonds include: (1) the Durant Independent School District Project in Durant, OK – Bond No. SB003000154 ("Durant Project"); (2) the Folsom Dam Project in Folsom, CA – Bond No. SB003000269; ("Folsom Project); (3) the Commissary Project in Fort Carson, CO – Bond No. SB003000316 ("Fort Carson Project); and (4) the ARC Project in the Woodlands, TX – Bond No. SB0030000349 ("Woodlands Project). (MPSJ – RD #28 & 28.1). While Plaintiff lists these bonds in its Motion for Partial Summary Judgment and references the fact that they are included in the GIA agreement, Plaintiff provides no details about any alleged breaches of the same. (MPSJ – RD #28 & 28.1). As such, Defendant is left to speculate about the context and reasons for the over $140,000 in damages claimed related to the same. (MPSJ – RD #28 & 28.1) This will be discussed in more detail in subsequent sections of this Response.

2.7     Plaintiff filed suit against Defendants on 2/16/15 asserting causes of action for breach of the indemnity agreement based on payments made on bonds for five separate projects outlined in their amended complaint as: (1) The Austin Project; (2) The Folsom Dam Project; (3) The Commissary Facility; and (4) the Durant Project, and a cause of action for exoneration. (Ex. E). Defendants responded to the amended complaint by denying many of the allegations and asserting defenses of voluntary payment based on the initial breach by S&P that absolved Strong of its liability and because of payments made by the Plaintiff that were outside the scope of Strong's work. (Ex. F). Furthermore, Defendants asserted violations of the duty of good faith by Plaintiff for

failing to properly investigate the claims prior to making payment and making payments for items that were overbilled and/or outside the scope of work to be performed by Strong. (Ex. F). Defendants also allege that Plaintiff failed to mitigate damages and waived performance by Strong by blocking efforts to mitigate and reduce the financial obligations by Defendants per the terms of the agreement. (Ex. F).

## B. Big Picture Facts

2.8    What really happened on the Austin Project is fully set out in Strong's First Amended Complaint against Satterfield & Pontikes Construction, Inc., Peter J. Holland, Charles T. Fote, Jr., and Laura T. Pontikes in American Arbitration Association proceeding No. 70-20-1400-0130 attached hereto as Exhibit D #7.  S&P failed to properly plan the timeline and manage the construction process for the Austin Project. (Ex. B ¶3-7).  When Strong refused to do extra work and pay for overcharges and delays created by the architect, S&P, and other subcontractors, S&P declared Strong in default and sought to have all of those same items paid for by Strong's bond company Ullico. (Ex. B¶8).   S&P knew that Ullico would be forced to make difficult decisions about payments, including additional work and overcharges. (Ex. B ¶8).   Strong is now actively pursuing his claims against S&P in the above referenced arbitration proceeding. (Ex. D. 7).  While Strong sympathizes with the position that S&P has put Ullico in, it does not excuse Ullico from its duties of good faith and reasonable payment as outlined below.

### III.

### Summary Judgment Response Evidence

3.1    In support of this Response, Defendants rely on the pleadings, the discovery responses on file (if any) and the following documents listed in Exhibit A to this Response.

## IV.

## Summary of the Argument

4.1     Plaintiff is not entitled to a partial summary judgment as a matter of law because there are still numerous facts issues in this case and the Plaintiff has failed to prove all of the elements of its causes of action as a matter of law.  Defendants allege voluntary payment because the Plaintiff chose to pay claims that were outside the scope of work, breach of the duty of good faith because the Plaintiff failed to investigate and heed warnings that there were being overcharged and paying claims outside the Defendants scope of work, and that Plaintiff failed to mitigate its damages.  More specifically, Plaintiff has an implied duty of good faith and there remains a fact issue as to whether the same has been breached in relation to payments made in this case.  Defendants advised Plaintiff prior to the filing of this suit and in some instances prior to the payment of various claims that the amounts therein were overcharges or outside of Defendant's scope of work.  Plaintiff nonetheless voluntarily decided to pay such claims and now seeks reimbursement for the same.

4.2     Furthermore, Plaintiff is claiming damages for breaches of five different bonds, but only provides evidence of a breach of one bond in support of their motion.  Plaintiff has failed to prove the elements of a breach of contract cause of action for all five bonds allegedly at issue in this lawsuit and Defendant has presented a fact question on each of these bonds, and thus, Plaintiff is not entitled to summary judgment on causes of action and damages based on breaches of bonds that it has failed to prove.  Finally Plaintiff is seeking over $140,000 in recovery of attorney's fees and expenses and Defendants have the right to contest the reasonableness of same, however are currently prevented from doing so due the heavily redacted nature of the same.  There is still a fact issue concerning whether the attorney fees sought are reasonable and necessary.

## V.

### Summary Judgment Standard

5.1     Although summary judgment is proper in a case in which there is no genuine dispute of material fact, this is not such a case. *See* Fed. R. Civ. P. 56(a); *Celotex Corp., v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable inferences are drawn in favor of the nonmoving party, but the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Medical Center,* 476 F.3d 337, 343 (5th Cir. 2007). The nonmovant must go beyond the pleadings in the case and designate specific facts that prove the existence of at least one genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The court must resolve all reasonable doubts about the facts in favor of the nonmovant. *Cooper Tire & Rubber Co. v. Farese,* 423 F.3d 446, 455-56 (5th Cir. 2005).

## VI.

### Arguments and Authorities

6.1     Plaintiff's factual allegations and summary judgment evidence have numerous holes, leaves out many of the numerous fact issues that exist in this case, and fails to meet the burden required of the Plaintiff for summary judgment.

**A.     Minnesota Law Applies based on the Texas Choice of Law Rules**

6.2     It appears that both parties agree that Minnesota law applies to the GIA at issue in this case (See Plaintiff's Motion §§4-6).  A federal court sitting in diversity jurisdiction will apply the choice of law rules of the forum state, Texas. *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005).  The GIA contains a choice of law clause in section 12.24 that states, "This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota." (Ex.).  In general, Texas law will enforce a contractual choice of law provision unless "(1) the contract bears no reasonable relation to the chosen state, or (2) the law of the chosen state violates a fundamental public policy of Texas." *Exxon Corp. v. Burglin,* 4 F.3d 1294, 1298 n.5 (5th Cir. 1993).  In this case, the GIA bears a reasonable relation to Minnesota since the Plaintiff is a Minnesota Business Corporation. (Ex. G).

**B.      A Fact Question Exists as to Whether and/or to What Extent Defendants Have Breached Any Contractual Obligation to Reimburse the Plaintiff.**

6.3     Plaintiff has alleged a cause of action for breach of a contractual indemnity agreement.  Under Minnesota law, the basic elements of a breach of contract cause of action are (a) the formation of a contract; (b) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant; and (c) breach of the contract by defendant. *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.,* 848 N.W.2d 539 (Minn. 2014).  However, in the context of indemnity agreements, it is well settled Minnesota law that an indemnitee owes a duty of good faith to its indemnitor. *See. New Amsterdam Cas. Co. v. Lundquist,* 198 N.W.2d 543, 549 (1972) ("We adopt this rule and hold that an indemnitee owes a duty of good faith to its indemnitor and that any act of the indemnitee which prejudices the rights of the indemnitor will release his obligation to the extent of the prejudice).

6.4    Furthermore, at a more basic level, under Minnesota law a surety owes its principal a common law duty of good faith. *U.S. Fid. & Guar. Co. v. Falk*, 7 N.W.2d 398 (Min. 1943).   In addition, the surety also must also provide proper proof of the reasonableness of the payments made to attorneys or other parties under a surety agreement. *Id.* at 401-402.  Defendants are not required to prove any type of fraud or fraudulent intent in order to establish bad faith. *Liberty Mut. Ins. Co. v. Northeast Concrete Product, LLC*, 756 N.W.2d 93, 99 (Minn. App. 2008).   Thus, Plaintiff owes the Defendants a duty of good faith and any act that prejudices the rights of Defendants will release Defendants' obligations to the extent of prejudice.   Therefore, in order to avoid summary judgment, Defendant is only required to raise a fact issue on whether the Plaintiff acted in good faith in making payments, the extent of payments or the reasonableness of the fees charged, and stepping-in on certain projects.   The duty of good faith owed the indemnitor includes the investigation of the claim and any decision concerning defending or settling the claim, including the amount for which to settle. *Lange v. Fidelity & Cas. Co. of New York,* 185 N.W.2d 881, 884-885 (Minn. 1971).   A jury should determine whether there is a breach of the duty of good faith and reasonableness of costs and offsets. *Lundquist,* 198 N.W.2d at 287-289.

6.5    First and foremost, as previously outlined in the Background Facts section, Defendants fully deny that they breached any agreement with S&P or any other alleged claimant.  To this end, Defendants have instituted an Arbitration action against S&P, Peter Holland, Charles Fote, Jr., and Laura Pontikes.  However, regardless of this overarching dispute, the affirmative evidence also shows that Defendants repeatedly advised Plaintiffs against paying various invoices from S&P and other subcontractors. Defendants specifically outlined why numerous payments to be made on the Austin Project were improper and should not be paid by Plaintiff.   Plaintiff chose to disregard

these warnings and pay these claims anyway.  As such, Plaintiff cannot as a matter of law now show that it acted in good faith in paying these disputed claims.

6.6     In this case, there are numerous instances to support defendants' allegations that Plaintiff overpaid or improperly paid on the claims at issue.   Furthermore, these instances of overpayment and improper payment were brought to the attention of the Plaintiff prior to suit being filed in this case and in some instances prior to the payments actually being made to the contractors.   Plaintiff attached limited documentation concerning payments made to its Motion for Partial Summary Judgment that largely consisted of checks and attorney bills. (MPSJ RD #28 & 28.1 ).

6.7     As previously outlined, Ullico actually retained Strong, among other subcontractors, to complete the work on the Austin Project even after default was declared by S&P and Ullico became directly involved in the construction. (Ex. B ¶8) Ullico and their attorneys also began to provide Strong and his attorney with bills for review and comment prior to payment. (Ex. B ¶8, Ex D).  Strong and his attorneys reviewed these bills and began to point out numerous instances where Ullico was being overcharged, charged for work that was not within the scope of Strong's work, and other payment problems. (Ex. B, Ex. D. 1-5).  These letters include:

| DATE | BATES # | DISPUTED CLAIMS |
|---|---|---|
| 05/18/12 | | Strong and his attorney outline the following inconsistencies and inaccuracies that occur in the Standard Drywall Inc. ("SDI") and King Masonry, LLC, ("King") bills in this case.  This includes possible double dipping by SDI and additional work that was caused by S&P's failures.  The letter explicitly points out that, "as you well know, paying these claims will be very damaging to my clients and Ullico has a responsibility to protect SSS' interests as much as Ullico wants to protect its own." |
| 12/28/12 | | Strong and his attorney outline the fact that Perry & Perry Builders ("P&P") appear to be charging for grinding and other items that were not a part of the Strong scope of work.  The letter also outlines painting performed that was largely not a part of Strong's scope of work.  Defendants painted the most accurate picture they could of all overcharges based on the limited invoices being provided by S&P and the subcontractors.   The letter |

| | | |
|---|---|---|
| | | specifically points out that, "my clients, including your principal, vehemently object to Ullico taking steps to settle the claim of S&P without our involvement. … Therefore it would not be reasonable for Ullico to offer any payment to S&P in this matter." |
| 01/02/13 | | Strong and his attorney outline the fact that P&P was charging for primer removal on each weld, which was not a part of the original contract with Strong and thus are improper charges. The letter also outlines the fact that most of the painting charges were not within the scope of Strong's work. The letter also points out that per diem charges by P&P were not proper for local men. This letter also outlines overcharges by P&P for the forklift, scissor lift, 60 Ft. boom, and 80 Ft. boom. Defendants once again painted the most accurate picture they could of all overcharges based on the limited invoices being provided by S&P and the subcontractors. The letter specifically points out once again that, "my clients, including your principal vehemently object to Ullico taking steps to settle the claim of S&P without our involvement. … Therefore it would not be reasonable for Ullico to offer any payment to S&P in this matter." |
| 01/28/13 | | Strong and his attorney outline the fact that P&P overcharged S&P for equipment for work they performed. The letter goes on to detail the overcharging for use of a 60-foot boom and 80-foot boom at much higher rates than were generally charged. It also outlines charges by P&P related to the grinding of primer that was not part of scope of Strong's work. |

(Ex D. 1-4).

Plaintiff failed to act in good faith in this case with respect to in its inadequate investigation and decision to pay certain claims, the amounts paid, the extent of payments made, and allegedly stepping-in Projects involving no proper bond claims.

**C.     Plaintiff Wholly Fails to Meet Its Burden of Proof with Respect to Any Causes of Action and Damages Related to Four of the Five Projects Allegedly at Issue.**

6.8     Plaintiff seeks summary judgment reimbursement under the GIA for $397,307.69. Per Plaintiff's Declaration, this amount is calculated by adding up all of the amounts owed on each of the five projects outlined as $862,080.39 and subtracting a credit of $464,772.70. (MPSJ – RD #28.1). As outlined in Plaintiff's Declarations exhibit, this damage amount includes damages from five different projects, not just the Austin Project. (MPSJ – RD #28 & 28.1). While Plaintiff claims damages for breach of the GIA for five different projects, the Motion actually only addresses the Austin Project up until

the damages section. (MPSJ – RD #28 & 28.1).  As such, Plaintiff provides no evidence of any breach by Strong or claim by another party for four of the five projects for which indemnity is sought: (1) the Durant Project, (2) Folsom Project, (3) Fort Carson Project and (4) Woodlands Project.

6.9     On a most basic level, the GIA does not contain all of the elements of the contractual relationship between the Plaintiff and Strong, and therefore, one cannot prove all of the elements of a breach of an indemnity obligation by only looking at the GIA. (Ex. C).  Instead, the GIA was entered into in conjunction with and incorporates the requirements of the actual bonds issued on these projects.  Any payments made by the Plaintiff are subject to the requirements of the original bonds issued on the projects.

6.10    Under Minnesota surety law, "the surety is not liable unless the principal is." *Psoch v. Lion Bonding Sur. Co.,* 163 N.W. 131, 132 (Min. 1917).  Thus, as a basic proposition to liability, it must be proven that Strong was liable on any of these alleged bond breaches.  Plaintiff has provided little to no evidence of how Strong was ever liable on the Durant bond, Folsom bond, Fort Carson bond, or Woodlands bond.  Yet, Plaintiff believes that it is entitled to summary judgment as to all damages they claim to have paid under all bonds.  Plaintiff has failed to show a breach of the terms of the bonds on these four projects or that the terms of the same were satisfied prior to any payment being issued.

6.11    In order for Plaintiff to prove its entitlement to damages for breach of an indemnity agreement, Plaintiff must provide more evidence than "I paid money to an attorney" or "I paid money to a contractor so you must reimburse me."  Any indemnity sought under the GIA must be related to a triggering of the Plaintiff's duties under a specific bond.  In general, most bonds require a specific type of notice by a claimant and specification of the amount of the claim.  Plaintiff, as the movant, has the burden to

prove all elements of the causes of action asserted for all damages asserted herein and has failed to do so.

i. **Plaintiff Fails to Prove its Cause of Action or Damages on the Durant Project, Fort Carson Project, and Woodlands Project**

6.12    Plaintiff outlines $2,805.56 in attorney's fees and expenses allegedly related to each of three projects: (1) Durant Project; (2) Folsom Project; and (3) Woodlands Project for which it seeks reimbursement.  Plaintiff affirmatively states that bonds were issued for each of these three projects, but fails to address any of the specific terms of the same. Plaintiff fails to provide any evidence of a claim being made under this bond by anyone or what necessitated the payment of $2,805.56 in attorneys' fees and expenses.  Due to the vague nature of these claims, Defendants are left to speculate about what events transpired on the bonds in each of these three projects and why the Plaintiff paid these amounts on each of theses projects.  In addition, Lamar Strong presents a fact question as to the alleged payments on these jobs (Exhibit B ¶10).

ii. **Plaintiff Fails to prove its Cause of Action or Damages on the Folsom Project**

6.13    Plaintiff outlines $2,805.56 in attorney's fees and expenses allegedly related to the Folsom Project for which is seeks reimbursement.  Once again, Plaintiff fails to provide any evidence of a claim being made under this bond by anyone or what necessitated the payment of $2,805.56 in attorneys' fees and expenses.  Plaintiff also outlines payments to Standard Drywall of Austin, Texas for $10,077.00, Perry & Perry Builder's Inc. of Rockdale, Texas for $95,242.00, and C&Z Enterprises, LLC of Pflugerville, Texas for $25,000.00 for which it seeks recovery.  Interestingly, the Plaintiff provides heavily redacted attorney fee bills and copies of the checks to attorneys, however Plaintiff provides no billing documentation for any of the contractor payments.  Instead, the sole documentation provided is a copy of the check issued to each contractor by Ullico.

Once again, the Plaintiff fails to establish that any of these payments were made pursuant to any breach of a bond by Strong.

6.14    The fact that the Plaintiff sua sponte chose to make payments to these entities does not prove that such payments were required under the terms of the bonds issued and thus subject to reimbursement pursuant to the GIA.  Such payments were not made to these contractors for work performed on the Folsom Project. (Ex. B ¶10).  The Folsom Project took place in Folsom, CA and all of these contractors are located in Texas. Furthermore, Defendants have not received any notices of default under the bond issued on the Folsom Project. (Ex. B ¶10).  Defendants are wholly unsure why such payments were issued to these contractors for the Folsom Project, and thus why Plaintiff is entitled to reimbursement under the GIA.  Plaintiff must prove what section of the GIA it is seeking to recover under.  The Defendants should not be forced to speculate about what section might be applicable to each payment received or what actions might have caused these payments to be made.  Plaintiff is seeking an affirmative summary judgment and must prove all elements of its claims.

6.15    Plaintiff appears to be arguing that under the terms of the GIA, all they must do is swear to the amount and provide some record of payment and that this satisfies its evidentiary burden under all laws and elements to any cause of action they might allege.  While this documentation may be considered prima facie evidence of the fact and extent of liability per the terms of the GIA, it does not absolve the Plaintiff of its duty at law to satisfy all of the elements of its cause of action.  This section of the GIA does not state in any way that this documentation constitutes prima facie evidence of the Principals obligation to a claimant, or prima facie evidence that all payments were made in good faith or prima facie evidence that all payments were reasonable. Defendants do not presently have any reason to dispute that these payments were

made, however, Defendants have been and continue to dispute that they should be made and the extent of the payments made.

**D.    The Reasonableness and Necessity of Plaintiff's Attorney's Fees Damages Present a Fact Issue in this Case.**

6.16    In Plaintiff's Motion, it specifically outlines roughly $140,000 solely related to attorney's fees and expenses for Ullico. (MPSJ – RD #28 & 28.1).  We have previously outlined some of the problems with these listed attorney's fees and expenses.  In addition, pursuant to *Falk,* 7 N.W.2d at 401-402, Defendants have the right to contest the reasonableness of attorney's fees and expenses incurred by a surety pursuant to any surety agreement.  Furthermore, Defendants' have the right to have a jury determine whether those fees are in fact unreasonable or excessive. *Id.*  The key problem is that Defendants are presently unable to contest the same because they are largely unsure what work these legal fees encompassed because the bills submitted are heavily redacted, and Defendants can therefore not determine the reasonableness of the same. (MPSJ – RD #28.1).

6.17    In conjunction with Plaintiff's Motion for Summary Judgment, Plaintiff attached numerous bills from their attorneys Langley and Weinstein LLP and Weinstein Radcliff LLP. (MPSJ – RD #28.1).  The problem is that these bills are heavily redacted and therefore provide the Defendants with little to no information to contest the same. Plaintiff would argue that any determination on the reasonable amount of attorney's fees and the necessity of the same cannot be made until such time as un-redacted bills are provided to Defendants.  At that time, Defendants would then have enough information to contest the validity and reasonableness of the same.

## VII. Prayer

7.1     For theses reasons, Defendants ask the Court to deny the Plaintiff's Motion for Partial Summary Judgment.   In the alternative, Plaintiff requests the Court to deny portions of the Defendants' motion that the Court finds unmeritorious, and pray for any an all other relief at law or in equity.

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
221 West 6th Street, Suite 1800
Austin, Texas  78701
512/476-4600
512/476-5382 (Fax)

By: Craig A. Nevelow
     State Bar No. 14933580
     Christopher A. Shuley
     State Bar No. 24046839

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded by facsimile to all known counsel of record, in accordance with the Texas Rules of Civil Procedure, on this 16th day of October, 2015.

Robert K. Radcliff
Weinstein Radcliff, LLP
6688 North Central Expressway, Suite 675
Dallas, Texas  75206
214 865-6140 (facsimile)

Craig A. Nevelow